**Clinton H. PIERCE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

**No. 79A02–9209–CR–413.**

Court of Appeals of Indiana, Second District.

Sept. 28, 1994.

Transfer Denied Nov. 1, 1994.

Michael B. Troemel, Merritt, Troemel, Meyer & Hamilton, Lafayette, for appellant.

Pamela Carter, Atty. Gen., Suzann Weber Lupton, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

This case involves an apparent conflict between a criminal defendant's constitutional right to effective cross-examination and the inherent power of a trial court to direct the scope of cross-examination. The vehicle for this review is the appeal of Clinton Pierce, who contests his conviction of Attempted Murder[1] and two counts of Battery[2], both Class C felonies.

On January 6, 1990, Pierce was at the Linwood Tavern and ran into the victim, Nina Lockhard,[3] and her friend, Linda Butler. The three began to argue until one of the tavern's owners escorted Pierce away from the women, warning Pierce that he would be asked to leave if he didn't calm down. Pierce did leave, telling Lockhard and Butler that he was going to get a gun and shoot them. Pierce returned to the tavern approximately one-half hour later with a .25–caliber handgun.

---

1. I.C. 35–42–1–1 and I.C. 35–41–4–5 (Burns Code Ed.1994).

2. Pierce was also convicted of battery with a deadly weapon and battery resulting in serious bodily injury, I.C. 35–42–2–1 (Burns Code Ed. 1994). These two convictions were merged in the attempted murder conviction.

3. The State refers to the victim throughout its brief as "Nina Lockwood." In fact, the victim's last name is "Lockhard."

Pierce passed the two women on his way back into the bar and patted his pocket, saying, "I have it." Record at 485. After sitting at the bar for a few minutes, Pierce walked over to where the two women were seated and asked, "Which of you want [sic] it first?" *Id.* Lockhard responded, "I do," and Pierce complied with her request. *Id.* After the shooting, the bartender persuaded Pierce to turn over the gun and sit at the end of the bar until the police arrived. Lockhard was taken to the hospital where a bullet was found lodged near her spine. Pierce was taken into custody and admitted shooting Lockhard.

At trial, several of the tavern patrons and staff present during the shooting testified against Pierce. One such witness was Melvin Linback, the bartender at the Linwood Tavern. At the time of trial, Linback was incarcerated in prison on an unrelated cocaine-dealing conviction. Prior to trial, the judge granted the State's motion in limine prohibiting all reference to Linback's conviction. The ruling was based upon the fact that dealing cocaine is not a crime probative of credibility and therefore not admissible for impeachment.

In his preliminary questions to Linback, defense counsel attempted to ask Linback where he lived. The State objected, arguing that admitting evidence would render the prior *in limine* ruling meaningless. After brief oral argument, the court refused to allow defense counsel to inquire as to Linback's residence. Pierce's defense was that he was incapable of forming the intent to kill Lockhard by reason of voluntary intoxication. Pierce claims that Linback's testimony was damaging to this theory of defense because Linback testified that Pierce was not extremely intoxicated, and therefore the court's ruling violated his Sixth Amendment right to confront the witnesses against him.

## I.

At the outset, we deem it appropriate to discuss the content of both principles.

---

**4.** In Indiana, there are nine infamous crimes which may be used to impeach a witness. These are: treason, murder, rape, arson, burglary, robbery, kidnapping, forgery, and perjury. *Ashton,*

## A. Impeachment by Prior Bad Acts

The Indiana rules of evidence allow impeachment of a witness only by evidence of reputation or character. The rule prohibits impeachment of a witness by evidence of prior bad acts unless the act is an "infamous" crime [4] or a crime probative of credibility. *Ashton v. Anderson* (1972) 258 Ind. 51, 279 N.E.2d 210, 213. The reason for the "Bad Acts" rule is to prevent the jury from inferring that the witness must be a liar merely because he has done bad things. In other words, the rule seeks to prevent unfair prejudice to a witness where the evidence does not make it any more likely than not that he is untruthful. Accordingly, a conviction of dealing cocaine may not be used to impeach a witness. *Johnston v. State* (1988) Ind., 517 N.E.2d 397.

## B. Right of Cross–Examination

Pierce is correct in that the "right of cross-examination is included in the [Sixth Amendment] right of an accused in a criminal case to confront the witnesses against him." *Pointer v. Texas* (1965) 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923. It has been held that the defendant has the right to ask the witness who he is, where he lives, and what his business is. *Alford v. United States* (1931) 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; *Smith v. Illinois* (1968) 390 U.S. 129, 131, 88 S.Ct. 748, 749–50, 19 L.Ed.2d 956. Our Supreme Court has also recognized the constitutional protection given this type of information. The constitutional "right of cross-examination of the principal prosecution witness in a criminal trial includes the right to ask him questions as to his name and the place where he lives." *Crull v. State* (1989) Ind., 540 N.E.2d 1195, 1198.

## II. Conflict

The State argues that the rule embodied in *Ashton,* now Ind.R.Evid. 609(a), prevents admission of evidence that a witness is in prison.

---

*supra,* 279 N.E.2d at 213. Fed.R.Evid. 609(a), recently adopted effective January 1, 1994, as Ind.Rule 609(a), includes the crime of criminal confinement.

The State is correct in arguing that the constitutional right of cross-examination, like all other constitutional rights, is not absolute. Specifically, questions regarding a witness's address may be prohibited where there are legitimate concerns of prejudice, the witness's safety,[5] or interference with ongoing investigations. *Delaware v. Van Arsdall*, (1986) 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674. Such questions should ordinarily not be prohibited upon the theory that the witness's address is irrelevant. *Alford, supra*, 282 U.S. at 690, 51 S.Ct. at 219; *Crull, supra*, 540 N.E.2d at 1200; *Pigg v. State* (1992) 2d Dist. Ind.App., 591 N.E.2d 582, 584–85, *aff'd*, 603 N.E.2d 154.

Here, the trial court implicitly based its ruling upon concerns that the jury would be prejudiced against Linback's testimony because he was in prison.[6] Prejudice is an appropriate basis for a trial court to restrict cross-examination. *Van Arsdall, supra* 475 U.S. at 678–80, 106 S.Ct. at 1435. However, Pierce argues that to apply *Ashton* in this manner would impinge upon his federal constitutional right of cross-examination.

At first blush, it would appear that a defendant has an absolute right to question a witness as to his place of residence. *Smith v. Illinois, supra; Alford v. United States, supra; Crull v. State, supra; Pigg v. State, supra; but see Turnbow v. State*, (1994) 1st Dist. Ind.App., 637 N.E.2d 1329. That this is not the case however, may be seen from the exceptions which exist as to this "right", as earlier discussed. The particular exception which would appear to be most applicable in this instance is that which would give rise to an implication that because of the place of his residence, the witness is either a liar, a bad person or both. It is this aspect of evidence which the *Ashton* rule seeks to protect against.

Even if it were otherwise, Linback's testimony was supportive of Pierce's theory of defense, i.e., intoxication. Pierce claims that Linback testified that Pierce was not extremely intoxicated. We disagree. In fact, Linback corroborated Pierce's claims of intoxication. Linback testified that when he arrived at the bar at approximately 5:00 p.m., Pierce "had a good one going, a good drunk going...." Record at 512. Linback then testified that after Pierce left the bar at around 6:45 p.m., Linback noticed two beers, one more full than the other, and an empty shot glass at Pierce's seat. Linback testified that while Pierce was gone, he dumped one of the beers out because he "felt that he [Pierce] didn't need no more to drink." Record at 512. Linback testified that he thought Pierce was intoxicated and that he was not able to walk a straight line. Finally, Linback testified that after the shooting Pierce stated that he didn't know what he had done. The testimony could hardly have been more sympathetic toward Pierce's intoxication claim.

Even if Linback's testimony had been damaging, the error would nevertheless be harmless. A claim of intoxication, a statutory defense,[7] is not valid where the defendant is able to devise a plan to commit the crime, carry out acts requiring physical skill, or appreciate the wrongfulness of his conduct. *Terry v. State* (1984) Ind. 465 N.E.2d 1085, 1088 (defendant fled emergency room after dropping off victim and burned his own bloody clothes); *Boze v. State* (1987) Ind., 514 N.E.2d 275, 279 (defendant fled into the woods after attacking police officer). The case before us is unlike *Weaver v. State* (1994) 2d Dist. Ind.App., 627 N.E.2d 1311, the only Indiana case disclosed by our research which upholds the intoxication defense as a matter of law. In *Weaver*, the evidence compelled a conclusion that, by reason of intoxication, the defendant was incapable of formulating the intent to kill. Here, there was ample evidence to rebut Pierce's defense of intoxication.

Officer Randy Brooks, who took Pierce's statement at the police station, testified that

---

5. Although concern for a witness's safety is an appropriate basis for curtailing cross-examination, where the trial judge makes no effort to determine the reasonableness of the safety claim, reversal will result. *Crull, supra*, 540 N.E.2d at 1199.

6. The State objected to the evidence based upon the *Ashton* rule. The purpose of that rule is to prevent unfair prejudice to the witness's testimony.

7. I.C. 35–41–3–5 (Burns Code Ed.1994)

Pierce did not stumble, fall, or stagger, that he was steady on his feet, that he was coherent, and that he appeared to be aware of where he was and what he had been doing. Pierce was able to tell Officer Brooks his date of birth, social security number, and address from memory. During the statement, Pierce apologized for swearing, and after the notary public stammered, he told her not to be nervous. Eugene Robinson, a defense witness who testified that he and Pierce had been drinking since around 8:00 a.m., also stated that two hours before the shooting, Pierce was able to carry on a conversation, was able to get in and out of a car without help, and was able to hold his liquor. This evidence shows that Pierce's mental faculties were not so impaired as to render him incapable of controlling his conduct.

Lisa Ramsey testified that before the shooting she overheard Pierce tell another tavern patron that there would be trouble and that someone was going to die. After threatening Butler and Lockhard, Pierce left the tavern for approximately one-half hour. When he returned, he again spoke to the women in what witness Richard Conkright testified appeared to be a "very rational" manner. During this exchange, he asked which woman wanted to be shot first, and, when Lockhard answered in the affirmative, he shot her. Kimbra King testified that immediately after the shooting Pierce indicated that he knew he had acted wrongfully. Several witnesses, including Pierce himself, testified that Pierce told Lockhard and Butler that he was going home to get a gun in order to shoot them. Pierce then went home, got a gun, and shot Lockhard. This evidence shows that Pierce had formed a plan to shoot Lockhard, that Pierce carried out that plan, and that he understood that his conduct was wrong.

The evidence regarding Pierce's ability to form the intent to kill is overwhelming.

The judgment is affirmed.

FRIEDLANDER and NAJAM, JJ., concur.