Dale R. **RHODES**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 43A05–0110–CR–463.

Court of Appeals of Indiana.

July 29, 2002.

Kenneth R. Martin, Goshen, Indiana, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Rhodes argues that he was deprived of his right to a fair trial because the jury in his case was able to hear substantial evidence of other misconduct besides that for which he was on trial. In addition, Rhodes asserts that there was insufficient evidence to support his convictions. Because we find that the introduction of improper character evidence was so prejudicial that it rendered a fair trial impossible, we reverse Rhodes's conviction and remand for a new trial.

### Facts and Procedural History

In the early morning hours of November 7, 2000, Syracuse Police Officer Joe Salazar was at a Redi–Mart gas station getting gas for his patrol car. While at the Redi–Mart, Officer Salazar saw Rhodes driving a car with his girlfriend, Marlene Ralston, sitting in the passenger seat. Rhodes drove the car to a McClure's gas station across the street from the Redi–Mart and parked the vehicle. Ralston then exited the car from the passenger side door of the car with Rhodes exiting behind her from the same door. From earlier encounters with Rhodes, Officer Salazar knew that he was a habitual traffic violator and had a suspended driver's license. Officer Salazar had also received a report that Rhodes had been drinking earlier in the night at local bars. Based on this information, Officer Salazar called for police back up and drove across the street to confront Rhodes with driving while having a suspended license.

Upon being confronted by Officer Salazar, Rhodes denied that he had been driving the car and told him that Ralston had been the driver. Ralston also told the officer that she was driving the car. Officer Salazar noted that Rhodes appeared intoxicated, he was swaying back and forth, his speech was slurred, his eyes were bloodshot, and his breath smelled of alcohol. Officer Scott Hand arrived to assist Officer Salazar and noted that Rhodes appeared intoxicated. Ralston also appeared to be intoxicated.

The police officers arrested Rhodes and Ralston and took them to the Syracuse Police Station. Once at the police station, the officers gave Rhodes and Ralston field sobriety tests in separate rooms. Rhodes failed the sobriety test and refused to take a certified chemical test. During this period, Rhodes repeatedly shouted to Ralston, "stick to your story." Tr. p. 233. However, while Rhodes and Ralston were separated in different rooms, Officer Salazar advised Ralston that he knew that Rhodes was the driver and that if she continued to claim that she was driving, she would be charged with false informing. Ralston then told Officers Salazar and Hand that Rhodes was the one who had been driving the car.

The State charged Rhodes with Operating While Intoxicated (OWI) as a Class A misdemeanor[1] with an enhancement to a

---

1. Ind.Code § 9–30–5–2.

Class D felony for OWI with a prior conviction,[2] and Operating a Motor Vehicle While Privileges Are Suspended as a Habitual Traffic Violator (HTV).[3] Rhodes's jury trial was held on August 15, 2001. At trial, Rhodes and Ralston both testified that Ralston had been driving the car. Nevertheless, the jury returned guilty verdicts on both counts. After the jury returned its verdicts, Rhodes entered a guilty plea to the Class D felony OWI enhancement. On September 11, 2001, the trial court sentenced Rhodes to executed sentences of two years on both counts with the sentences to run concurrently. This appeal ensued.

### Discussion and Decision

Rhodes argues that he was deprived of his right to a fair trial because of the extensive introduction of improper character evidence including the introduction of Rhodes's entire driving record and testimony concerning a separate incident in which Rhodes operated a motor vehicle while his driving privileges were suspended. In addition, Rhodes asserts that there was insufficient evidence to support his convictions.

### I. Admissibility of Character Evidence

■ Rhodes argues that he was deprived of his right to a fair trial because improper character evidence was admitted, which allowed the jury in his case to learn of other misconduct beside that for which he was on trial. The admissibility of evidence is within the sound discretion of the trial court, and the decision whether to admit evidence will not be reversed absent a showing of manifest abuse of the trial court's discretion resulting in the denial of a fair trial. *Dumes v. State*, 718 N.E.2d 1171, 1174 (Ind.Ct.App.1999); *supplemented on reh'g by* 723 N.E.2d 460 (Ind.Ct.App. 2000). In determining admissibility of evidence, the reviewing court will only consider the evidence in favor of the trial court's ruling and unrefuted evidence in the defendant's favor. *Id.*

■ Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." *See also Thompson v. State*, 690 N.E.2d 224, 229 (Ind.1997); *Dumes*, 718 N.E.2d at 1175. The well-established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Thompson*, 690 N.E.2d at 233. Indeed, the prohibition on use of prior misconduct to prove a criminal charge is "a basic tenet of criminal evidence law older than the republic itself." *Id.* at 235 (quoting *Lannan v. State*, 600 N.E.2d 1334, 1338 (Ind.1992)).

■ Even if evidence of prior bad acts is admissible, its probative value must still be weighed against the unfair prejudice against a defendant that its admission may cause. *Jones v. State*, 708 N.E.2d 37, 40 (Ind.Ct.App.1999) (citing Ind. Evidence Rule 403), *trans. denied*. In particular, evidence of a prior conviction is as prejudicial as evidence can get, and requires a strong showing of probative value. *Thompson*, 690 N.E.2d at 235. Our cases have long admonished that "one crime cannot be proved in order to establish another distinct crime even though they be of the same kind. Such evidence is highly prejudicial." *Id.* (quoting *Loveless v. State*, 240 Ind. 534, 539, 166 N.E.2d 864, 866 (1960)).

---

**2.** Ind.Code § 9–30–5–3.

**3.** Ind.Code § 9–30–10–16.

Even oblique or apparently innocuous references to prior convictions are impermissible. *Thompson*, 690 N.E.2d at 235.

### A. Evidence of Defendant's Character Introduced During State's Case in Chief

■ During the State's case in chief, the Prosecution went to great lengths to present Rhodes's prior legal and alcohol problems to the jury. Officer Salazar testified that he knew that Rhodes was a HTV from knowledge he received from working at the Syracuse Police Department. While this evidence was proper because it explained why Officer Salazar investigated Rhodes after he witnessed him driving a car, the Prosecution then went on to elicit from Officer Salazar that his knowledge also came from "other run ins with Mr. Rhodes." Tr. p. 91. In addition, the following exchange occurred while the Prosecution was questioning Officer Hand:

Q. The other cases in which you had uh, contact with Mr. Rhodes, have some of those cases actually been when he's sober?

A. No sir.

Q. So pretty much every occasion you've been with him he's been intoxicated?

A. Correct.

Tr. p. 244. The State argues that Officer Hand's testimony concerning his previous experience with Rhodes was offered to indicate that he could recognize when Rhodes was intoxicated. However, Officer Hand's particular insight into Rhodes's drinking history was unnecessary. Officer Hand testified that he could tell Rhodes was intoxicated because he smelled of alcohol, was slow to respond, had slurred speech, and failed a sobriety test; therefore, Officer Hand's testimony concerning his previous experiences with Rhodes only served to highlight to the jury that Rhodes had a history of drunken encounters with the police.

■ The Prosecution also introduced Rhodes's complete driving record to the jury without any attempt to make redactions to the document. While the driving record established that Rhodes's license was suspended when the arrest occurred because of his HTV status, the unredacted record also informed the jury of convictions and suspensions that were unrelated to this case. From this document the jury was able to learn that Rhodes had 12 prior suspensions and a minimum of eight prior convictions.[4] Exhibit 1. More importantly, three of the listed suspensions and two of the listed convictions, including one for OWI, occurred after Rhodes was adjudicated as a HTV and could not have been the underlying charges upon which the HTV determination rested. These listed convictions were not relevant to Rhodes's HTV status, were not related to the crime for which he was charged, and should not have been admitted into evidence. *See Carpenter v. State*, 743 N.E.2d 326, 329 (Ind.Ct.App.2001), *trans. denied; Dumes*, 718 N.E.2d at 1174–76; *Jones*, 708 N.E.2d at 40.

■ During opening statements, the Prosecution noted that on the night of Rhodes's arrest there had been a domestic dispute between Rhodes and Ralston and

---

4. The suspensions listed on Rhodes's driving record include suspensions for: (1) no insurance-ticket (listed twice); (2) repeat insurance violation; (3) no insurance-accident; (4) prior OWI within 5 years; (5) habitual traffic violator-ten year; (6) chemical test failure (listed three times); (7) operating a vehicle with a blood alcohol content of .10% or more (operating per se); (8) failure to comply for DDC; and (9) failure to pay. Rhodes's convictions listed on his driving record include: (1) no insurance (listed twice); (2) prior OWI within 5 years; (3) leaving the scene of an accident; (4) operating per se (listed twice); (5) no valid license; and (6) driving left of center.

that Ralston was pregnant with Rhodes's baby. Then during the State's case in chief, Officer Salazar testified that on the night he arrested Rhodes for his driving violations, he had received a call that there was a domestic dispute between Rhodes and Ralston at a local tavern. When asked by the Prosecution to explain the meaning of "domestic dispute," Officer Salazar explained that Rhodes had kicked Ralston in the stomach and battered her. Tr. p. 89. Officer Salazar went on to testify that Ralston was pregnant when this battery occurred and when Rhodes was driving their car while intoxicated. Tr. p. 108. Both Officers Salazar and Hand testified that there had been numerous domestic disputes between Rhodes and Ralston. Tr. p. 89, 247. The Prosecution also called Ralston as a witness and asked her whether Rhodes had thrown a beer in her face and kicked her in the stomach during the dispute. Tr. p. 136.

The State argues that the evidence of the domestic dispute was not introduced to illustrate Rhodes's bad character; rather, it was introduced to impeach Ralston by establishing that her fear of physical abuse may have motivated her into providing conflicting statements to the police. While evidence of violence committed by the defendant against the witness can be used to establish the witness's bias by showing she could be testifying out of fear of the defendant, the witness must first deny fearing the defendant before the impeachment evidence can be introduced. *Lenover v. State*, 550 N.E.2d 1328, 1331 (Ind.Ct.App. 1990), *reh'g denied.* In this case, the Prosecution presented evidence about the domestic dispute before it even called Ralston as a witness; therefore, we find that this evidence served primarily to taint Rhodes's character rather than to impeach Ralston's testimony.

## B. Evidence of Witness's Character Introduced During the State's Case in Chief

The Prosecution's character attacks were not limited solely toward Rhodes. After presenting evidence to the jury that Rhodes kicked a pregnant Ralston in the stomach, the Prosecution began its examination of Ralston with an inquisition into her baby's legitimacy. After learning that Ralston had known Rhodes for two years, the following exchange occurred concerning Ralston's previous marriage to another individual:

Q. How long have you been divorced?

A. We've been separated for, since '98.

. . . .

Q. My question was when were you divorced.

A. We uh, the divorce was final January of this year [2001].

Q. Okay, that's when the divorce was actually granted?

A. Yes.

Q. How long have you lived with Dale Rhodes?

A. Almost two years.

Q. Do you have any children by Mr. Rhodes?

A. Yes I do.

Q. And uh, what's that child's name and when was that child born?

A. His name's [S.] and he was born May 9th.

Q. May 9th of this year?

A. Yes sir.

Q. And when did you become pregnant with [S.]?

A. Um, nine months from May.

Q. Which would have been? Answer the question please.

A. Uh, would that be September, October

Q. Of what year?

A. 2000.

Tr. p. 130–31. We are unable to see how this inquiry into the timing of Ralston's divorce and pregnancy was relevant in Rhodes's trial for driving-related crimes. Instead, this inquiry seems to serve no other purpose than to poison Rhodes's and Ralston's character in the eyes of the jury.

Evidence concerning Ralston's divorce was not limited to the inquiry into her baby's legitimacy. Later in the trial, the Prosecution asked whether Ralston often gave false statements. After Ralston denied that she did, the Prosecution questioned her about whether she had provided a trial court in another case with incorrect information concerning her place of employment and had made false statements in court proceedings. Tr. p. 144–46. Then during the State's rebuttal, the Prosecution introduced over Rhodes's objections a certified copy of the court docket sheet from the case of *Ralston v. Ralston.* Tr. p. 298–300. The docket sheet was from Ralston's divorce case and once again highlighted the date that her divorce became final. Information contained in the docket sheet indicated that Ralston provided the court with inaccurate information as to her place of employment. The docket sheet also informed the jury that Ralston had been found in contempt of court for failing to pay child support. Exhibit 2. During closing argument, the Prosecution advised the jury to look at the docket sheet to judge Ralston's credibility. Tr. p. 311–12.

A witness may not be impeached by specific acts of misconduct that have not resulted in criminal convictions. *Palmer v. State,* 654 N.E.2d 844, 848 (Ind. Ct.App.1995). Indiana Evidence Rule 608(b) states, in relevant part: "[f]or the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, specific instances may not be inquired into or prov-

en by extrinsic evidence." *State v. Walton,* 715 N.E.2d 824, 827 (Ind.1999). In turn, Indiana Evidence Rule 609(a) "prohibits impeachment of a witness by evidence of prior bad acts unless the act is an 'infamous' crime or a crime probative of credibility." *Pierce v. State,* 640 N.E.2d 730, 732 (Ind.Ct.App.1994), *trans. denied.* In this case, the Prosecution sought to impeach Ralston's credibility with a specific act of misconduct, an incident in which she provided inaccurate information to another court. Because that specific act did not result in a criminal conviction of misconduct, evidence of Ralston's false statement in a court proceeding along with the additional character evidence documented on the court docket sheet should not have been admitted.

### C. Character Evidence Introduced During Defendant's Rebuttal

The Prosecution continued to introduce evidence of other bad acts committed by Rhodes during its cross-examination of Rhodes. While Rhodes testified during direct examination about the events that led to his arrest for the crimes for which he was on trial, he alluded to another driving incident by stating, "Marlene won't let me drive. She uh, uh, the last incident was a medical emergency and that's the only reason she let me drive." Tr. p. 262. Based on this reference to an incident of driving which involved a medical emergency, the Prosecution asked Rhodes, "Were you convicted of operating as a habitual traffic violator for an incident that happened after November 7th of the year 2000?" Tr. p. 270. Rhodes admitted that he had previously pled guilty to operating a motor vehicle as a HTV for an incident that occurred three months after the incident for which he was on trial, which he characterized as a medical emergency.

After Rhodes admitted that he pled guilty to this other HTV violation, the Prosecution proceeded to question him about the details surrounding that HTV arrest. Rhodes objected to this further inquiry under Evidence Rule 404(b). The trial court found that this evidence was admissible because Rhodes had opened the door by mentioning another incident involving a "medical emergency." Tr. p. 272–73. After the trial court overruled Rhodes's objection, the jury learned that in January 2001, a police officer stopped Rhodes while he was driving a car with Ralston in the passenger seat. When stopped, Rhodes switched seats with Ralston and told the police officer that Ralston had been driving. Rhodes testified that he later admitted that he had lied about the incident and pled guilty to operating a motor vehicle as a HTV. The Prosecution then formally linked the January 2001 incident with the incident for Rhodes, isn't that exactly the same thing that happened here in November?" Tr. p. 274. During closing argument, the Prosecution again compared the incident for which Rhodes was on trial with the one that occurred in January in which Rhodes drove as a HTV, switched seats with Ralston when he was stopped, and claimed that Ralston was the one driving. Tr. p. 315–16.

Otherwise inadmissible evidence under Rule 404(b) may become admissible where the defendant "opens the door" to questioning on that evidence. *Jackson v. State*, 728 N.E.2d 147, 152 (Ind.2000); *see also* 13 Robert Lowell Miller, Jr., INDIANA EVIDENCE § 608.207 at 150 (2d ed.1995). However, "evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Ortiz v. State*, 741 N.E.2d 1203, 1208 (Ind.2001) (quoting *Gilliam v. State*, 270 Ind. 71, 77, 383 N.E.2d 297, 301 (1978)).

Assuming that Rhodes's reference to driving a car on another occasion because of a medical emergency left a false impression with the jury, it was the false impression that he was not guilty on another occasion of operating a motor vehicle while a HTV. Therefore, the door of inquiry was only open as to Rhodes's other HTV conviction. Once Rhodes admitted that he pled guilty to the HTV violation, any possible false impression was remedied, thereby closing the door to further inquiry. Thus, we find that additional inquiry into Rhodes's other HTV arrest was improper after he admitted that he pled guilty to the HTV violation. Furthermore, we find that the unfair prejudicial impact of the evidence surrounding Rhodes's January HTV arrest substantially outweighed its probative value. The Prosecution formally linked the November and January incidents, thereby actively encouraging the jury to make the "forbidden inference." Therefore, we conclude that the trial court abused its discretion in allowing additional inquiry into Rhodes's other HTV conviction.

■■■ The Prosecution also questioned Rhodes about a 1997 OWI offense and the violation of probation that stemmed from that conviction. The State asserts that this evidence was properly admitted to impeach Rhodes based on his answer to this earlier inquiry from the Prosecution:

> Q. Mr. Rhodes, would it be safe to say that you do not have a good relationship with the Syracuse Police Department?
>
> A. It is safe to say that, yes.
>
> Q. Is it safe to say that you don't have a good relationship because of your criminal actions that they've had to stop over the past several years?
>
> A. I haven't been in any trouble since 1997.

Tr. p. 286. The State argues that Rhodes's answer opened the door to further inquiry into his 1997 OWI arrest. We disagree. When a defendant has not previously offered evidence of his own character, the Prosecution cannot ask about his relationship with the police and then claim that the defendant opened the door to further inquiry when he provides an answer. *See Newman v. State*, 719 N.E.2d 832, 836 (Ind.Ct.App.1999) (finding that the defendant did not open the door into an inquiry into his character when the statements made by defendant were elicited by the State on cross-examination), *trans. denied*. Moreover, Rhodes's answer to the Prosecution's question did not create a false impression about his OWI conviction; Rhodes testified that he had not been in trouble since 1997 and his OWI offense occurred in 1997. Therefore, evidence about Rhodes's 1997 OWI did not impeach his testimony; rather it only served to create the inference that Rhodes had a criminal propensity to operate a vehicle while intoxicated.

### D. Reversible Error

 Rhodes did not object to much of the character evidence at issue when it was introduced during trial. Typically, the failure to object to these admissions would result in waiver of the issue and prove fatal to Rhodes's appeal. If a defendant does not object contemporaneously with the introduction of the evidence, appellate review of the issue is waived unless the admission of evidence constitutes fundamental error. *Sauerheber v. State*, 698 N.E.2d 796, 804 (Ind.1998). A fundamental error is a substantial, blatant violation of basic principles of due process rendering the trial unfair to the defendant. *Taylor v. State*, 717 N.E.2d 90, 93 (Ind.1999). The fundamental error doctrine applies only when the harm or potential for harm cannot be denied. *Id.* (citing *Ford v. State*, 704 N.E.2d 457, 461 (Ind.1998)). In

order to qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Sauerheber*, 698 N.E.2d at 804. We find that in this case the introduction of improper character evidence was so blatant and so pervasive that it rendered a fair trial impossible.

 "In its effort to prove guilt, the State may not 'flood the courtroom' with unnecessary and prejudicial details of prior criminal conduct merely because some of that evidence is relevant and admissible." *Thompson*, 690 N.E.2d at 236 (quoting *United States v. Smith*, 80 F.3d 1188, 1193 (7th Cir.1996)). Rule 404(b) is on the books because evidence of prior crimes is presumptively prejudicial. *Id.* Even where a prior criminal act is relevant to a material fact, the potential for unfair prejudice dictates that the evidence of the prior misconduct be limited to that necessary to prove the disputed fact. *Id.*

In this case, the Prosecution did not just flood the courtroom with unnecessary and prejudicial details of prior criminal conduct; its case in chief seemed to be a focused inquiry into Rhodes's and Ralston's prior misconduct. From inquiries into Rhodes's driving convictions, alcohol problems, and history of domestic violence to questions concerning the legitimacy of Rhodes and Ralston's child and the circumstances surrounding Ralston's divorce, the Prosecution made a trial about a driving violation into one about Rhodes's and Ralston's character. The flood of irrelevant and prejudicial evidence did not just make a fair trial unlikely, it made it impossible. Therefore, we find that in this case, the introduction of improper character evidence constituted fundamental error.

Moreover, even if the sheer volume and particularly prejudicial nature of the improperly admitted character evidence did not rise to the level of fundamental error,

we note that Rhodes properly preserved his objection concerning the introduction of evidence from his January 2001 arrest for operating a motor vehicle while a habitual traffic violator and this evidence alone was enough to reverse Rhodes's conviction. Because Rhodes claimed that Ralston was the individual actually driving the vehicle on the date of his arrest, his credibility was directly at issue. Thus, the admission of evidence describing a similar set of circumstances in which Rhodes drove a car and then falsely accused Ralston of driving could have very easily resulted in the jury finding Rhodes guilty based on his actions on that occasion, rather than on the evidence concerning the incident for which he was actually on trial. Therefore, we reverse Rhodes's convictions.

## II. Sufficiency of the Evidence

 Even though we are reversing Rhodes's convictions because of the admission of improper character evidence, we must still evaluate the sufficiency of the evidence presented at Rhodes's trial in order to determine whether Rhodes can be tried again on these charges. Generally, when reversal is due to trial error in the admission of evidence, the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, does not bar a retrial on the same crimes. *Thompson,* 690 N.E.2d at 237 (citing *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988)). However, double jeopardy forbids a retrial—even where the defendant requests it as in this case—if the reviewing court concludes that the evidence is legally insufficient to support the conviction. *Id.* (citing *Champlain v. State,* 681 N.E.2d 696, 702 (Ind.1997)).

 Evidence is sufficient if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.* When reviewing the sufficiency of the evidence, we neither reweigh evidence nor judge witness credibility. *James v. State,* 755 N.E.2d 226, 229 (Ind. Ct.App.2001), *trans. denied.* Instead, we examine only the evidence favorable to the judgment, together with the reasonable inferences to be drawn therefrom. *Id.*

 In this case, Officer Salazar testified that he witnessed Rhodes driving a vehicle and that he appeared intoxicated. Officer Hand also testified that Rhodes failed a field sobriety test. In addition, Rhodes's certified driving record was introduced into evidence showing that his driving privileges had been suspended due to his adjudication as a HTV and that Rhodes had received notice of the suspension. Therefore, we find the Double Jeopardy Clause does not preclude a retrial in this case because there was sufficient evidence from which the jury could have convicted Rhodes of operating while intoxicated and operating a motor vehicle while privileges are suspended as a habitual traffic violator. Thus, we remand this case for a new trial.

Judgment reversed and remanded.

RILEY, J., concurs.

MATTINGLY–MAY, J., concurs in result with opinion.

MATTINGLY–MAY, Judge, concurring in result.

Although I agree that Rhodes is entitled to a new trial, I would decide this case under a slightly different analysis. I am not convinced, as is the majority, that "[t]he flood of irrelevant and prejudicial evidence did not just make a fair trial unlikely, it made it impossible." (Op. at 1256.) I do believe, however, that the introduction of this evidence was error and was not harmless.

In *Pierce v. State*, 761 N.E.2d 826, 829 (Ind.2002), error in admitting evidence that was "substantially more prejudicial than probative" was found to be harmless where there was "significant, uncontested evidence of Pierce's guilt." In *Trammell v. State*, 751 N.E.2d 283, 288 (Ind.Ct.App. 2001), we determined the admission of objectionable evidence of a prior bad act was not reversible error where another witness had testified without objection about the same incident.

Here, the evidence as to whether Rhodes was driving the car was not uncontroverted. In fact, only one witness—Officer Salazar—testified that Rhodes was both intoxicated and driving the car. Both Rhodes and Ralston testified that Rhodes had not been driving the car. Because Rhodes's jury did not have before it the "significant, uncontested evidence of ... guilt" we noted in *Pierce*, I believe the impact on the jury of the objectionable evidence may not have been "sufficiently minor so as not to affect the substantial rights of the parties." *Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995).