**Patricia G. HENSON, Appellant**
**(Defendant Below),**

v.

**STATE of Indiana, Appellee**
**(Plaintiff Below).**

No. 27A04–8805–CR–151.

Court of Appeals of Indiana,
Fourth District.

Nov. 30, 1988.

---

James A. McKown, Jr., Marion, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

CONOVER, Presiding Judge.

Defendant–Appellant Patricia Henson (Patricia) appeals her conviction for voluntary manslaughter, a class B felony. I.C. 35–42–1–3.

We reverse.

Because we reverse, we address only the issue of whether the trial court erred in admitting rebuttal testimony concerning Patricia's adulterous acts.

On November 12, 1986, Patricia went in search of her husband, Gary, who was late arriving home from work. She found him in a bar drinking with a co-worker. After exchanging unpleasant words, they left the bar separately.

When Patricia and Gary returned home, they began to argue. Gary shoved and slapped Patricia until she crouched in a corner of their bedroom. He then stopped and walked out of the room. Patricia subsequently went to the bedroom closet and got a gun. As Gary walked down the hallway leading from the bedroom, she yelled something at him. Gary turned around in response and began to walk toward the bedroom. Patricia then shot him in the neck. Thereafter, she called the police to report the shooting.

Gary was hospitalized immediately. The bullet had severed his spinal cord, paralyzing him. He died several weeks later.

Patricia was convicted by a jury of voluntary manslaughter, a class B felony. She was sentenced to the presumptive term of ten years. She now appeals.

Patricia contends the trial court erred in admitting rebuttal testimony concerning her adulterous acts. On cross-examination the State questioned Patricia regarding several instances of adultery. After a general denial, she admitted to an extramarital affair. However, on re-direct examination, she seemed to deny the affair was sexual in nature.[1] Subsequently, on rebuttal, the

---

1. Patricia admitted to an affair during cross-examination when she testified:

    Q. So you deny then, Mrs. Henson, to any adulteress conduct?

    A. I didn't say I never did, I said I got tired of hearing it until the point where he [her husband] kept askin' me and accusin' me of it, till I done it.

State produced four witnesses to such affairs. One of the witnesses testified he was one of her paramours, while the other three testified to having knowledge of the affairs through either personal observation or Patricia's own admission. Patricia maintains the testimony was collateral to the issues of the case and prejudicial. In response, the State argues the rebuttal testimony was proper for purposes of impeachment.

We note at the outset the questions propounded by the State on cross-examination regarding Patricia's adulterous affairs were outside the scope of cross-examination. It is well-settled cross-examination must lie within the scope of direct examination. *Ingram v. State* (1981), Ind., 426 N.E.2d 18, 20. Stated differently, cross-examination is limited to subjects brought out on direct examination. *Howard v. State* (1976), 265 Ind. 503, 355 N.E.2d 833, 835. The scope of cross-examination extends to all phases of the subject matter covered in direct examination and not only those areas specifically included in the direct examiner's questions. *Id.* 355 N.E.2d at 836. However, where cross-examination goes beyond the subjects brought out in direct examination, that testimony may be properly excluded. *Ingram, supra,* at 20.

██ Here, defense counsel objected several times to the State's cross-examination of Patricia regarding extramarital affairs. Counsel asserted such testimony was beyond the scope of cross-examination. We agree. Patricia at no time testified to any such affair, either directly or indirectly, during her direct examination. Counsel's objections should have been sustained and the testimony should have been excluded.

██ In regard to the State's assertion the rebuttal testimony was proper for purposes of impeachment, we disagree. The

Q. O.K. So admit then to adulterous affairs during—
A. I admitted it to him, too.
Q. You admitted it to him?
A. After I had done it.
(R. 321–322).

However, on re-direct examination she seemed to deny the affair was sexual in nature. The following colloquy took place:

impeachment of a defendant or witness by matters collateral to the case is prohibited. *Smith v. State* (1983), Ind., 455 N.E.2d 346, 354; *Gaston v. State* (1983), Ind.App., 451 N.E.2d 360, 362, *trans. denied.* A matter is collateral if the party seeking to introduce it for purposes of contradiction would not be entitled to prove it as part of his case-in-chief. *Id.*

Here, the question is not whether Patricia was guilty or innocent, but whether she received a fair trial. *Bryant v. State* (1973), 261 Ind. 172, 301 N.E.2d 179, 184. After a careful examination of the record, it is obvious the testimony of the rebuttal witnesses had no relevance to Patricia's guilt or innocence. The testimony was not material to the matter in litigation. We can find no basis for the State's introduction of the rebuttal testimony other than to prejudice the jury against Patricia. When improper evidence is used in such a manner, it is termed an "evidentiary harpoon" and its admission is improper. *Hooper v. State* (1983), Ind., 443 N.E.2d 822, 826.

It is also obvious the State's objective was to elicit testimony in rebuttal which was not directly admissible in its case-in-chief. Thus, the testimony was collateral to the issues of the case, and its admission on rebuttal for purposes of impeachment was improper.

We further note it is questionable whether Patricia actually denied the extramarital affair. If she did not deny the affair, there was no basis for impeachment and the admission of the rebuttal testimony was improper.

Reversed and remanded for a new trial.

MILLER and STATON, JJ., concur.

Q. ... But you're also saying that you did not have sex with Steve Andrews [her paramour]?
A. Not at that time, no I didn't.
Q. ... had you had sex with Steve Andrews anytime before November 12th of 1986?
A. I had went out with him, maybe once or twice, but no—we didn't haven't go (sic) out with each as often as what it's bein' said.
(R. 330).