**David R. CAMM, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 22A01–0208–CR–326.

Court of Appeals of Indiana.

Aug. 10, 2004.

Katharine C. Liell, Stacy R. Uliana, Liell & McNeil, Bloomington, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

BARNES, Judge.

### Case Summary

David R. Camm appeals his three convictions for the murder of his wife and two children. We reverse.

### Issues

The dispositive issue we address today is whether the trial court committed reversible error by allowing the State to present extensive evidence of extramarital sexual activity by Camm. For retrial purposes, we also address other issues that Camm has raised.

### Facts

The evidence most favorable to the convictions is that on the evening of September 28, 2000, Camm shot and killed his wife Kim and their children, seven-year-old Brad and five-year-old Jill, at their home in Georgetown. The shooting took place in the Camms' garage, apparently sometime after 7:30 p.m., when Kim and the children would have been due to arrive home from Brad's swimming practice. Camm's version of events was that he was playing basketball at a nearby church from 7:00 p.m. until approximately 9:20 p.m., after which he drove home and found Kim,

whom he immediately thought was dead, lying on the ground next to her Bronco. He then claimed to have looked inside the vehicle and found Jill and Brad. Camm thought Brad might still be alive, so he reached in over Jill, removed him from the Bronco, placed him on the garage floor next to Kim, and began performing CPR. When this proved futile, Camm said he called the Sellersburg Indiana State Police post for help, then ran across the street to his grandfather's house to tell his uncle, who was staying there, what had happened. Camm had been a State Police trooper for many years, but had quit the force several months earlier to work for a family business that, among other things, waterproofed basements.

Police showed the t-shirt Camm was wearing on the night of the 28th to a blood spatter expert. The expert believed certain blood droplets, which were later confirmed to be from Jill, found on one corner of the shirt were high velocity impact spatter resulting from a gunshot. Based in part on this evidence, on October 1, 2000, the State charged Camm with three counts of murder.[1]

On January 7, 2002, a jury trial began with the selection of jurors from Johnson County because of the extensive media coverage of the crime in the Louisville area. The trial continued in Floyd County until March 15, 2002, when the jury retired to deliberate. The key physical evidence against Camm was the purported high velocity blood spatter on his t-shirt, which was challenged by Camm's forensic expert. The State also presented extensive evidence of Camm's personal life, specifically, evidence that he had had several sexual encounters with or propositioned women

other than Kim during his time with the State Police. On March 17, 2002, the jury informed the trial court that it was deadlocked; the trial court instructed the jury to continue deliberating. Later that day, the jury returned with guilty verdicts on all three counts. Camm was sentenced to a total of 195 years, and he now appeals.

## Analysis

### I. Evidence of Camm's Adultery

██ During the State's case-in-chief, it presented the testimony of twelve women who had had various types of relationships with Camm since 1991. At one end of the romantic spectrum were three women with whom Camm had had prolonged sexual relationships, the most recent of which occurred in 1997. Camm had a relationship with one of these women, Stephanie Neely, while he was separated from Kim in 1994 and had moved out of the family home and into an apartment. On the other end of the spectrum were two women to whom Camm apparently made implied sexual advances, such as offering to take care of one woman's basement waterproofing bill in "other ways." Tr. p. 2848. Two other women testified as to more overt sexual overtures that they had rebuffed. The remaining five women, who had varying levels of acquaintanceship with Camm, had had at least one instance of sexual contact with Camm, including kissing, fondling and, in some instances, intercourse, but little else besides what the women described as extensive flirting. Some of the women were asked during their testimony to divulge details of their relationships with Camm, such as when, where, and how they engaged in sexual activities, including such details as the shaving of pubic hair. Camm filed a motion in limine challenging

---

1. Several other claims in the probable cause affidavit were later deemed to be unsubstantiated and were not used against Camm at trial, including that the crime scene had been cleaned with a "high Ph cleaning substance," and that a neighbor heard "three distinct sounds that can be interpreted as gunshots" between 9:15 and 9:30 p.m. App. pp. 55–56.

the admissibility of this evidence and repeated his objection at trial. He argues that the admission of this evidence was an attack on his character not admissible for any proper purpose under Indiana Evidence Rule 404(b).

■ A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its rulings only where it is shown that the court abused that discretion. *Griffith v. State,* 788 N.E.2d 835, 839 (Ind.2003). Evidence Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

"This rule prevents the State from punishing people for their character. . . ." *Bassett v. State,* 795 N.E.2d 1050, 1053 (Ind.2003). Evidence of other wrongs or acts poses the danger that a jury may convict a defendant because his or her "general character" is bad. *Id.* (quoting *Gibbs v. State,* 538 N.E.2d 937, 939 (Ind.1989)). In determining the admissibility of extrinsic act evidence under Evidence Rule 404(b), courts must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the person's propensity to engage in a wrongful act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Id.* Otherwise admissible evidence may be rendered inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Ind. Evidence Rule 403.

■ The State asserts that this evidence was offered to establish motive. With respect to the motive "exception" in Evidence Rule 404(b), our supreme court has said that motive is "always relevant" when proving a crime. *Ross v. State,* 676 N.E.2d 339, 346 (Ind.1996). It is clear, however, that just because motive is "always relevant," this does not mean the State can introduce questionable character evidence simply by labeling it evidence of "motive." If the State's claim of relevance to motive is too strained and remote to be reasonable, then the extrinsic act evidence is inadmissible. *See Bassett,* 795 N.E.2d at 1053.

■ Our supreme court has also said that evidence of extrinsic acts may be relevant as proof of motive if the acts "show the relationship between the defendant and the victim." *Ross,* 676 N.E.2d at 346. This rationale has been used to uphold the introduction of evidence of prior violence or threats by the defendant against the victim in a trial alleging the battery or homicide of the victim. *See id.; Price v. State,* 619 N.E.2d 582, 584 (Ind.1993). Specifically, "where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime—'hostility.' " *Spencer v. State,* 703 N.E.2d 1053, 1056 (Ind.1999).

Neither party has cited to this court, nor has our own research revealed, any Indiana case that has discussed the admissibility, as evidence of motive, of a defendant's adulterous affairs in a trial where the defendant is accused of killing his or her spouse. The Indiana case closest to being on point appears to be *Henson v. State,* 530 N.E.2d 768 (Ind.Ct.App.1988), *trans. denied.* In that case, a wife was charged with the voluntary manslaughter of her husband. On cross-examination of the wife, the State questioned her regard-

ing several alleged instances of adultery; her answers to the questions were equivocal. Thereafter, on rebuttal the State presented four witnesses to the affairs. We reversed the wife's conviction, holding (1) that the State's cross-examination regarding adultery was outside the scope of the wife's direct examination and (2) that the rebuttal evidence of the affairs was immaterial and "had no relevance to [the wife's] guilt or innocence." *Id.* at 770. We further stated, "We can find no basis for the State's introduction of the rebuttal testimony other than to prejudice the jury against [the wife]." *Id.* The opinion does not address, however, whether the adultery evidence could have been relevant to establishing motive, presumably because that was not argued by the State. Nevertheless, *Henson* does evidence healthy skepticism about the relevance and admissibility of evidence of extramarital affairs by a defendant charged with killing his or her spouse.

There is a general paucity of cases throughout the country discussing the issue of adultery as evidence of motive to kill one's spouse.[2] However, we have discovered that the Supreme Court of Mississippi has addressed precisely this issue in detail and in a manner that appears to us entirely consistent with Indiana case law and Indiana Evidence Rule 404(b). In *Lesley v. State,* 606 So.2d 1084 (Miss.1992), a wife was convicted of conspiring with a lover to murder her husband. The wife admitted to the affair with the accused lover. However, the husband was also allowed to testify as to two other men with whom his wife allegedly had had extramarital affairs in previous years. The Mississippi Supreme Court reversed the wife's

conviction based upon its application of Mississippi Evidence Rule 404(b), which is virtually identical to Indiana Evidence Rule 404(b).[3] *Id.* at 1089–90. First, it noted that the other two alleged affairs had occurred years before the conspiracy to commit murder arose and thus were too chronologically remote. *Id.* at 1090. It also noted that the husband had failed to prove that the alleged affairs had actually taken place. *Id.* Finally, and most relevant to this case, the court stated:

> Any extramarital affairs of Loretta Lesley other than the affair with Hood [the current lover and alleged co-conspirator] were not part of any chain of events leading to the planned murder of Dale Lesley. Additionally, proof of previous extramarital affairs lacked relevance into the murder conspiracy and was so prejudicial as to fail any balancing test under Rule 403. Her alleged prior adultery did not make it more likely than not that she committed conspiracy to commit murder, and it did inflame any listener.

*Id.* The court held it was improper to use this evidence "only to show that she had a motive for killing her husband because she was unhappy in her marriage and had a reason for wanting to 'get rid' of her husband. The only effect of such testimony was to show the jury that she was a 'bad woman.' " *Id.* The court also distinguished the case before it from cases in other jurisdictions that had allowed evidence of extramarital affairs to be introduced, noting among other things that in the other cases the "evidence of adultery was introduced in combination with evidence of violence or current conduct [an ongoing affair at the time of the murder] to show mo-

---

2. This is apart from cases addressing "heat of passion" killings where the victim was engaged in adultery and the spouse killed the victim upon discovering it.

3. The Mississippi rule expressly allows introduction of "bad acts" evidence as proof of "opportunity," while the Indiana rule does not.

tive." *Id.* at 1090–91 (citing *State v. Green,* 232 Kan. 116, 652 P.2d 697 (1982) and *Commonwealth v. Heller,* 369 Pa. 457, 87 A.2d 287 (1952)). We, too, have discovered that insofar as evidence of adultery has sometimes been admitted as evidence of motive in a murder trial in other jurisdictions, such evidence has been that the defendant was engaged in an affair at the time of the murder. *See United States v. Stapleton,* 730 F.Supp. 1375, 1378–79 (W.D.Va.1990); *Givens v. State,* 273 Ga. 818, 546 S.E.2d 509, 512 (2001).

In another case, the Seventh Circuit addressed the admission into evidence of a defendant's extramarital affair in a trial for solicitation to murder the defendant's wife. *Cramer v. Fahner,* 683 F.2d 1376 (7th Cir.1982), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509. The court held that although the prosecution failed to make a tie between adultery and motive as it had claimed it would, the mention of the affair by the defendant's co-conspirator was relevant to explain the relationship between the defendant and co-conspirator and why the murder plot was delayed: the defendant, an attorney, had explained to the co-conspirator that he might have to order additional murders if the mother-in-law of the woman with whom he had had an affair, and who was the wife of one of his clients, continued to press an ethical complaint with the bar. *Id.* at 1384. However, the court went on to state that the trial court "should not have allowed prolonged questioning on cross-examination of petitioner's wife on her knowledge of petitioner's adultery and bar association problems...." *Id.* The court did not find this error to warrant habeas corpus relief because the trial court had given a proper limiting instruction regarding the evidence, the error did not deprive the defendant of fundamental due process of law, and the evidence against the defendant was strong. *Id.* at 1385.

■ We conclude it is clear from the above authorities and Indiana law that evidence of a defendant's marital infidelity is not automatically admissible as proof of motive in a trial for murder or attempted murder of the defendant's spouse. Instead, to be admissible as proof of motive, the State must do more than argue that the defendant must have been unhappily married or was a poor husband or wife, ergo he or she had a motive to murder his or her spouse. This court has previously discussed and acknowledged the high rate of marital infidelity in this country, with some studies estimating that between thirty to fifty percent of women and fifty to seventy percent of men have been unfaithful to their spouses. *Jaunese v. State,* 701 N.E.2d 1282, 1284 n. 3 (Ind.Ct.App.1998). Rather, to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and victim in the past, or that the defendant was involved in an extramarital relationship at the time of the completed or contemplated homicide. The admissibility of such evidence may be further constrained by concerns of chronological remoteness, insufficient proof of the extrinsic act, or the general concern that the unfair prejudicial effect of certain evidence might substantially outweigh its probative value in a particular case.

There was clearly sufficient proof of Camm's philandering, and at least some of his activities took place relatively near in time to Kim's murder. However, there was no evidence of a violent or hostile relationship between Camm and his wife, nor any evidence that he ever threatened her with harm. Camm did apparently lose his temper in 1994 following a conflict over an affair at a time when he and Kim apparently were separated. The only evi-

dence in the record with respect to this incident, which we will discuss in more detail, was that Kim was not even present when Camm caused some minor property damage in his home. There is no evidence that Camm ever battered Kim or issued any threats, either to her directly or to others.[4]

There was no evidence that Camm was involved in an extramarital relationship at the time of Kim's murder. Ten days before the murder, Camm had apparently asked a woman with whom he had had a relationship in 1992 and 1993 whether she would be interested in having sex again, and she declined. Camm evidently had asked the same or similar question of this woman on previous occasions. There is no evidence that Camm and this woman, or any other woman, were involved in a romantic relationship at the time of Kim's murder.

Nonetheless, the State argues in its brief, "Under the State's theory, the Defendant did have a defect in his character to allow him to engage in these acts. He did not act as a proper husband and father." Appellee's Br. p. 23. This amounts to a virtual concession that the evidence of Camm's extramarital sexual escapades was introduced to establish that he was a person of poor character who was more likely to commit murder because of that character. This is precisely what Evidence Rule 404(b) and volumes of case law prohibit. The law simply does not allow the State to pursue conviction of a defendant on the basis that his character is "defective." This principle has been recognized for many years. It represents the cumulative wisdom and knowledge gleaned from hundreds, if not thousands, of trials conducted over the years as to the inherent unfairness of such evidence. Professor Wigmore observed 100 years ago:

> The deep tendency of human nature is to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot help operating with any jury, in or out of court.... Our rule, then, firmly and universally established in policy and tradition, is that the prosecution may not initially attack the defendant's character.

John H. Wigmore, *A Treatise on the System of Evidence in Trials at Common Law* 1:126–27 (1904). *See also Foreman v. State*, 203 Ind. 324, 327, 180 N.E. 291, 292 (1932) (stating "general moral character cannot be established on direct or redirect examination by proof of particular acts or of remote extraneous crimes."). We see no indication that our supreme court wishes to discard Evidence Rule 404(b) and overrule numerous cases regarding the general inadmissibility of bad character evidence. *See, e.g., Bassett*, 795 N.E.2d at 1053. Nor, in our view, would such a momentous change in the law, which would conflict with well-settled law throughout the country, be appropriate. We therefore conclude the trial court abused its discretion in allowing the State to introduce evidence of Camm's adulterous conduct in its case-in-chief because the tie between such evidence and motive, or anything other than simply portraying Camm as "bad," is too strained and remote to be reasonable. *See id.* Even if this evidence had minimal probative value as proof of motive, its prejudicial effect substantially outweighed such value under Evidence Rule 403, particularly given the ex-

---

4. Camm allegedly told one of the women who testified that Kim was a "bitch" on a few occasions between 1996 and 1998. Tr. p. 2873. This alone cannot be construed as a threat to harm Kim.

tent to which the State emphasized this evidence.

 Closely related to the issue of the twelve women who testified as to Camm's adulterous nature during the State's case-in-chief, is the rebuttal testimony of a female guard at the jail where Camm was awaiting trial, who testified that Camm said to her shortly before her upcoming wedding "that I still had time for one last fling." Tr. p. 6984. Clearly, this evidence is along the same lines as the inadmissible testimony of the twelve women who testified during the State's case-in-chief regarding Camm sexually propositioning them. The State contends that Camm opened the door to this evidence during his cross-examination by the prosecutor; it offers no other basis for its admissibility. During cross-examination, after the prosecutor accused Camm of being self-centered, Camm said, "Right now it's all about Brad and Jill and Kim." Tr. p. 6723. The prosecutor then asked Camm whether he had propositioned the jail guard in November 2001; Camm said that he could not recall doing so. The State points to nothing on Camm's direct examination that might have opened the door to the guard's testimony. Statements made by a defendant that are elicited by the State on cross-examination cannot be relied upon to "open the door" to otherwise inadmissible evidence. *Newman v. State,* 719 N.E.2d 832, 836 (Ind.Ct.App.1999), *trans. denied* (2000); *see also Kien v. State,* 782 N.E.2d 398, 409 (Ind.Ct.App. 2003) (holding that although a party may inquire into a collateral matter on cross-examination, "the questioner is bound by the answer received and may not impeach the witness with extrinsic evidence unless the evidence would be independently admissible."), *trans. denied; Rhodes v. State,* 771 N.E.2d 1246, 1256 (Ind.Ct.App.2002), *trans. denied; Roth v. State,* 550 N.E.2d 104, 105 n. 1 (Ind.Ct.App.1990), *trans. de-*

*nied.* Thus, the guard's rebuttal testimony was improper.

 The State argues that the admission of the evidence of Camm's sexual affairs and propositioning during its case-in-chief and on rebuttal does not constitute reversible error because the trial court gave admonishments and a limiting instruction regarding it. At first, the trial court told the jury that the adultery evidence "has been received on the issue of motive and for impeachment purposes" and that the jury should only consider it for those purposes. Tr. p. 2755. After the jury expressed confusion over how impeachment applied in the case, the trial court modified the admonishment to "[t]his evidence has been received on the issues of motive and credibility." Tr. p. 2832. The trial court also gave a final instruction containing identical language. *See* Tr. p. 7126.

 It is true that a timely and accurate admonishment is presumed to cure any error in the admission of evidence. *Kirby v. State,* 774 N.E.2d 523, 535 (Ind. Ct.App.2002), *trans. denied.* The trial court's admonishments and limiting instruction in this case did not cure the error in the admission of evidence of Camm's adultery. First, the admonishments and instruction allowed the jury to consider such evidence as proof of motive. We have held that the evidence was not admissible for that purpose.

Second, the trial court originally admonished the jury that it could consider the extramarital affair evidence for impeachment purposes. This reference to impeachment undoubtedly was confusing, because Camm had not testified to the contrary regarding any of the incidents presented during the State's case-in-chief. The jury, in fact, expressed to the court its confusion over this admonishment. To

the extent the trial court then altered its admonishment to say that the extramarital affair evidence could be used for "credibility" purposes, without any limitation or definition as to "credibility," it allowed for the possibility that the jury would have felt free to use the fact that Camm regularly cheated or attempted to cheat on his wife to discount his testimony on any matter, including his account of the events of September 28, 2000. Clearly, this is the very thing that Evidence Rule 404(b), not to mention Evidence Rule 608 governing and limiting "credibility" evidence,[5] are designed to prevent: judging a defendant based upon evidence of poor character and not upon evidence related to the present charges.

▇▇ The State also argues briefly and without citation to authority that it was allowed to introduce the testimony of the women in order to "impeach" out-of-court statements Camm had made to others, including police interrogators, regarding the overall good state of his marriage to Kim at the time of the murders that the State introduced into evidence during its case-in-chief. The failure to cite authority waives this argument for our review. *Bartley v. State*, 800 N.E.2d 193, 196 (Ind.Ct.App. 2003). This is especially true given that "impeachment" is understood to refer to challenging a witness' credibility with respect to testimony, not the credibility of unsworn pretrial statements. *See, e.g.,*

Black's Law Dictionary 578 (7th ed.1999) (defining "impeachment evidence" as "Evidence used to undermine a witness's credibility"). Additionally, it was the State, not Camm, that injected the issue of his relationship with Kim into the trial. Clearly, the State here attempted to "bootstrap" otherwise inadmissible evidence regarding Camm's affairs into the trial by arguing about it during opening statements and introducing out-of-court statements made by Camm wherein he had discussed his relationship with Kim. This is impermissible. *See Willey v. State*, 712 N.E.2d 434, 444 (Ind.1999) (holding State could not "bootstrap" introduction of hearsay statements regarding murder victim's fear of defendant by reading during opening argument defendant's statement to the police saying he had threatened the victim, and where defendant did not attempt to portray relationship with victim as harmonious during his opening statement). We have reviewed the opening statement of Camm's attorney and have found that, as in *Willey*, he did not place the issue of Camm's relationship with Kim into the trial or attempt to portray their relationship as harmonious. Therefore, pursuant to *Willey*, the State was not given carte blanche to delve into otherwise inadmissible details of Camm's personal life merely because he mentioned his relationship with Kim in out-of-court statements.[6] *See also Appleton v. State*, 740 N.E.2d 122, 124

---

**5.** Evidence Rule 608 clearly limits evidence regarding a witness' credibility to opinion or reputation evidence only; specific instances of conduct such as were explored in this case are generally inadmissible, and always inadmissible on direct examination of a witness. Camm's argument, however, focuses primarily on Evidence Rule 404(b).

**6.** It is not entirely clear that Camm's pretrial statements directly conflicted with the women's testimony in any event, or at least most of their testimony. In those statements, Camm admits having been unfaithful to his wife in the past, with the last relationship he termed an "affair" occurring six years before the murder, which is when Camm and Kim were separated and he had moved out of the house. State's Ex. 20. He also said that his relationship with his wife had been "wonderful," especially in the last six months before the murders. State's Ex. 15. The most recent evidence of Camm having any physical contact with another woman was six months before the murders.

(Ind.2001) ("Trials should principally proceed on the basis of testimony given in court, not statements or affidavits obtained before trial.").

Finally, the State argues that the admission of this evidence was harmless. We disregard errors in the admission or exclusion of evidence as harmless unless the errors affect the substantial rights of the party. *Wilson v. State,* 770 N.E.2d 799, 802 (Ind.2002) (citing Ind. Trial Rule 61). To determine whether an error in the introduction of evidence affected a defendant's substantial rights, we must consider the probable impact of that evidence upon the jury. *Id.* The question is not whether there is sufficient evidence to support the conviction absent the erroneously admitted evidence, but whether the evidence was likely to have had a prejudicial impact on the jury. *Currie v. State,* 512 N.E.2d 882, 883–84 (Ind.Ct.App. 1987), *trans. denied* (1989). Here, although we cannot say the evidence is insufficient to sustain Camm's convictions as a matter of law on appeal, we are left with the definite possibility that the jury might have found Camm not guilty of murdering his wife and two children if it had not been exposed to a substantial amount of improperly admitted and unfairly prejudicial evidence concerning his extramarital affairs and the State's use of that evidence to portray Camm as a person of poor character who was more likely to commit murder because of his indiscretions.

Eleven witnesses with varying degrees of familiarity with Camm [7] testified that he was playing basketball at a church at the time his wife and children most likely were murdered; although not all eleven were on precisely the same page as to the details of basketball games played one and a half years earlier, they all agreed that Camm was there the entire time and that even though he sat out at least one game, he did not leave the gym. The State's claim in opening argument that Camm made a phone call from his house at 7:19 p.m., which would have refuted the alibi witnesses' testimony that he was at the gym at that time, was found to be incorrect upon examination of a Verizon employee who testified that due to a software error concerning Indiana's unusual time zones, the call was placed instead at 6:19 p.m., when Camm said he was at home and before he left to play basketball. The State's gunshot residue expert, who found some gunshot residue particles on Camm's clothing, clearly testified, "you can't … make that judgment" that such evidence meant Camm was present when the gun was fired. Tr. p. 4590. There was some unexplained evidence found at the scene of the crime, such as the presence of unidentified DNA found on Kim's and Brad's pants, and a sweatshirt found underneath Brad that had the word "Backbone" written on the tag that also had unidentified DNA on it. The determination of Camm's guilt essentially came down to a "battle of the experts," with the State's blood spatter experts claiming certain blood spots on Camm's shirt that came from Jill were high velocity spatter and Camm's claiming it most likely was transferred by contact. The possibility clearly exists in this case that the improper admission of evidence may have consciously or subconsciously influenced which expert or experts the jury chose to believe and the weight it assigned to the testimony of Camm's alibi witnesses, not to mention Camm's own testimony.

Additionally, the State's attempt to minimize the impact of this evidence, by noting that "only" thirteen witnesses testified

---

7. Some of the witnesses were relatives; some were long-time friends; and some knew Camm only through playing basketball with him.

**1138**

about sexual advances by Camm out of eighty total witnesses for the State, is unavailing. Appellee's Br. p. 23. As Camm points out, in addition to the testimony of the thirteen women, the State devoted the first approximately one-quarter of its lengthy cross-examination of Camm to exploring his marital infidelity. During opening argument, the State dwelled at length upon this evidence, stating in part:

> You will hear the Defendant was a predator of women. Their marriage was plagued by the Defendant's continuous affairs. And these aren't affairs based upon admiration and love. These were sexual encounters that were disrespectful and humiliating.... He collected and devoured women.... And you will hear that while married to Kim those eleven years there were at least fifteen other women.... From strippers, to co-workers, to professional women, married or unmarried, the Defendant collected them just the same.

Tr. pp. 1216–17. The State began its closing argument by again referring to this evidence extensively:

> In November of 1994, the Defendant set himself upon a journey that would end in a hail of gunfire, destroying not only his family, but ultimately himself in an orgy of annihilation. In November of 1994 the Defendant looked upon the surface charms of Stephanie Neely, and having no ability to refute his whims, betrayed his wife and kids.... The Defendant went back to Kim where he betrayed her repeatedly and deliberately. He betrayed not only the honor of his family, but the trust of his badge and the honor of his profession. He used his

power to prey upon vulnerable women, the ones they met, the ones that he stopped. The Defendant cared for no one. He sought only his pleasures and it pleased him to invite his secret lover into the very presence of Kim.... He preyed upon woman after woman over the years. The Defendant is a devourer of women. He cares nothing for his immediate family, or extended family. He is willing to bring down upon their heads a holocaust of extermination and destruction.

Tr. pp. 7065–67. We need say no more. Clearly, the State's portrayal of Camm as an immoral, self-centered individual of poor character because of his philandering was central to its case.

Where the evidence against a defendant is far from overwhelming, as was the case here, and the determination of the jury depends in large part on assessing and weighing the credibility of witnesses, "it is paramount that the defendant be protected from evidence which has only the effect of reflecting unfavorably on his character." *Lehiy v. State,* 501 N.E.2d 451, 456 (Ind. Ct.App.1986), *adopted by Lehiy v. State,* 509 N.E.2d 1116 (Ind.1987). Although we are cognizant of the great financial and emotional expense invested in the first nine-week trial in this case, we cannot allow these convictions to stand. We reverse.[8] Because Camm does not assert that the evidence was insufficient to support his convictions, he may be retried. *See Goble v. State,* 766 N.E.2d 1, 7 (Ind.Ct. App.2002).

## II. Other Issues

Camm has raised a number of other issues with respect to the conduct of his trial. Because we have reversed on the

---

8. We would also note that aside from the prejudice to Camm, the admission of this evidence subjected the women testifying, some of whom were married, to potentially humiliat- ing public disclosure of intimate details of their personal lives, especially in light of the extensive mass media coverage of this trial.

basis of the erroneous admission of evidence regarding Camm's extramarital sexual activities, we will not address many of these issues in detail; some we will not address at all. However, for purposes of guidance on retrial, we will mention some of Camm's arguments.

 First, Camm challenges the trial court's allowing one of Kim's friends to relate a statement she made approximately three weeks before the murders. Specifically, in response to a question from the friend regarding Kim's relationship with Camm, Kim reportedly said, "History is repeating itself." Tr. p. 2991. The State essentially argues that the statement was not introduced as proof of the matter asserted, i.e. Camm was again being unfaithful, and, therefore, was not hearsay under Indiana Evidence Rule 801(c). Rather, the State argues, the statement indirectly established Kim's dissatisfaction with her marriage, or her state of mind at the time of the statement. If we assume the statement was not introduced for the truth of the matter asserted, which is doubtful,[9] the State technically is correct that the statement was not hearsay. A statement, the substantive content of which does not directly assert the declarant's state of mind, is not hearsay if it is admitted only to show the declarant's state of mind. *Angleton v. State*, 686 N.E.2d 803, 809 (Ind.1997). However, this does not relieve the burden of establishing that the declarant's state of mind is relevant under Indiana Evidence Rule 402. *See Willey*, 712 N.E.2d at 444. Evidence of a victim's state of mind is relevant and admissible "(1) to show the intent of the victim to act in a particular way, (2) *when*

*the defendant puts the victim's state of mind in issue,* and (3) sometimes to explain physical injuries suffered by the victim." *Hatcher v. State*, 735 N.E.2d 1155, 1161 (Ind.2000) (emphasis added). Camm did not put Kim's state of mind in issue in this case. Additionally, to the extent the State argues the comment was admissible "as reflecting Kim's assessment of the marriage," Appellee's Br. p. 33, our supreme court has expressly refused to allow "the admissibility of a victim's state of mind to show the nature of the relationship between the victim and the defendant." *Hatcher*, 735 N.E.2d at 1161. We conclude that the statement "History is repeating itself" was inadmissible. Tr. p. 2991.

 The trial court also allowed the State to introduce evidence, through the testimony of three police officers, of a 1994 incident in which Camm lost his temper and caused some minimal property damage to his house and household furnishings. The outburst was apparently prompted by a confrontation, with either Kim or Camm's mother, regarding the separation and his affair with Stephanie Neely. Camm's mother called police to Camm's house, but they filed no report regarding the incident. There was no evidence that Kim was even present at the house when Camm had lost his temper or that he had threatened her with any harm. In *Spencer v. State*, our supreme court stated that evidence of the defendant battering his girlfriend three years before her murder was of low probative value because of the time lapse between the prior incidents and the murder. 703 N.E.2d at 1056.

---

9. No limiting instruction was given regarding the use to which the jury could put this statement. Additionally, the State is inconsistent on this point, as it states as part of its argument that the statement was not hearsay, "The statement also suggested that the reason Kim was dissatisfied with the marriage was that she suspected that the Defendant was once again cheating on her." Appellee's Br. p. 33. That would seem to be using the statement for the truth of the matter asserted—Camm was again being unfaithful.

The court said it was "inclined to think this evidence should not have been admitted, but cannot say that the trial court abused its discretion" in doing so. *Id.* Here, we are faced with an incident occurring six years before the murders in which the only evidence is that Camm took out his frustrations on household furnishings in Kim's absence. With the *Spencer* court's holding that evidence of a battery occurring three years before the victim's murder was of low probative value, we believe it was clearly wrong here to admit evidence here of a non-battery occurring six years before the murders. The probative value of this evidence was too miniscule and its potential prejudicial effect was too high to be admissible.

The State also introduced evidence that Jill had possibly been molested hours before her death. It argued that Camm was likely the culprit and that he murdered Jill and the rest of his family either to escape detection or after a confrontation with Kim regarding the alleged molestation. The medical examiner who conducted Jill's autopsy testified that there was trauma to her genital region consistent with either molestation or a straddle fall; there was no penetration of the hymen, however. The State also presented evidence that Jill had complained of vaginal irritation on at least two prior occasions, the last time being a few days before the murders. Finally, it presented evidence that some of Jill's DNA was found on Camm's bedspread, which could have come from saliva or vaginal secretions. However, none of Jill's DNA was found in the two locations where seminal material from Camm was also found on the bedspread. In fact, at one of those locations Camm's seminal material was mixed with Kim's DNA.[10]

Camm did not object to the introduction of this evidence at trial. Therefore, we need not definitively resolve his claim of error on this point. We would note our agreement that evidence Camm had molested Jill would be relevant as proof of motive under Evidence Rule 404(b). The closer question, it appears to us, is whether the evidence the State presented on this point was sufficiently probative to be admissible. The United States Supreme Court, in analyzing Federal Rules of Evidence 404(b) and 104(b), has held that in order for "other misconduct" evidence to be admissible, there must be sufficient evidence from which the jury could reasonably find the defendant's misconduct proven by a preponderance of the evidence. *See Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988). Our supreme court has said, "Indiana law is in accord with this requirement." *Clemens v. State,* 610 N.E.2d 236, 242 (Ind.1993). Additionally, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403. Given the arguments made on appeal, we anticipate in the event of a retrial that Camm will object to the introduction of this evidence. If that is the case, the trial court will need to carefully consider whether the highly inflammatory nature of this evidence substantially outweighs the probative value of any evidence that Camm molested Jill.

At trial, the State also presented the testimony of William Chapin, an expert in microscopy, who stated his belief that a very small particle of biological tissue found on Camm's t-shirt was likely deposited there by flight, although he could not say whether it was high velocity flight. Camm's attorney objected to this testimo-

---

**10.** Camm also mentioned in one of his statements to police, before being informed that there was evidence Jill had been molested, that his children often got into bed with him and Kim.

ny, noting that in Chapin's report the State had disclosed to Camm during discovery, Chapin had only offered the opinion that the particle in question was biological and described how the particle was resting on the shirt fibers, but had not stated an opinion as to how the particle had come to rest on the t-shirt. Camm's attorney asserted he was not prepared to address this issue; the trial court responded by allowing counsel to depose Chapin over lunch.

We recently addressed an issue similar to this in *Beauchamp v. State*, 788 N.E.2d 881 (Ind.Ct.App.2003). In that case, we held it was reversible error for the State not to disclose that one of its expert witnesses had changed his opinion regarding the cause of a victim's injuries. *Id.* at 893–94. The failure to disclose the change of opinion violated both the trial court's standing discovery order and Indiana Trial Rule 26(E)(1). *Id.* Here, it is true, Chapin apparently did not change his opinion regarding any matter. It does appear, however, that he augmented the opinion given in his earlier disclosed report to reach the conclusion that the particle had been deposited by flight. It also appears that the State was fully aware of this opinion and was prepared to examine Chapin regarding it. Here, the trial court's standing discovery order through trial required the State to disclose "[a]ny and all reports . . . or statements of experts made in connection with this particular case," as well as the subject matter of any expected expert witness' testimony. App. p. 82. Indiana Trial Rule 26(E)(1) also requires parties to seasonably supplement discovery responses with respect to the subject-matter and substance of an expert witness' expected testimony. Neither the trial court's standing discovery order nor Trial Rule 26(E)(1) was complied with here, as was the case in *Beauchamp*. Obviously, however, in the event of retrial there should be no surprise regarding Chapin's testimony, and we need not determine whether this violation of discovery rules independently would have warranted reversal of Camm's conviction.

The final issue we address in detail in our opinion today is the trial court's refusal to allow Camm to introduce a photograph of Jill taken at the time of her autopsy showing the exit wound in her head and the hair around it shaved and the accompanying blood, apparently from her hair, that had transferred to a sheet lying underneath her. Camm's attorney wished to introduce the photograph in connection with the examination of his blood spatter expert to demonstrate possible ways in which Jill's blood could have been transferred to Camm's t-shirt by contact. The State successfully moved to exclude this photograph from admission as irrelevant and misleading because it did not depict Jill in the backseat of the Bronco where Camm claimed he likely came into contact with Jill's blood, and Camm's attorney could not guarantee that the blood visible in the photograph had not been dislodged when she was removed from the Bronco, placed in a body bag, transported to the medical examiner's office, and removed from the body bag.

We begin by noting that in this case, unlike so many others, it is the defendant, not the State, who was attempting to introduce an autopsy photograph of the victim. Generally, photographs depicting a victim's injuries, including showing a victim's wounds from different angles, or demonstrating a witness' testimony are relevant and therefore admissible. *Kubsch v. State*, 784 N.E.2d 905, 923 (Ind. 2003). To be admissible, a photograph must also be a true and accurate representation of what it is meant to portray. *Martin v. State*, 784 N.E.2d 997, 1007 (Ind. Ct.App.2003). To the extent the State argues the photograph was not a true and accurate representation of what it was in-

tended to portray because it does not portray Jill as she was found in the backseat of the Bronco, there is no dispute in this case that the photograph accurately depicted Jill at the time of her autopsy, which is sufficient for the purpose for which Camm sought to introduce the photograph. *See id.* Police apparently took no photographs in which Jill's exit wound as she lay in the Bronco is visible, thus Camm sought to introduce this photograph for the purpose of demonstrating another possible contact source of Jill's blood that was not visible in any other photograph; Camm did not seek introduction of the photograph as an accurate portrayal of the crime scene. How Jill's blood came to rest on Camm's t-shirt was the central issue in this case; the photograph was relevant to that issue.

Additionally, this case is factually similar to *Martin,* where a defendant claimed there was an inadequate foundation for the admission of photographs of the victim of a battery that resulted in the victim's death because the doctor who identified the victim and his injuries in the photographs had last seen the victim alive several hours before the pictures were taken at a coroner's office. The defendant contended the State failed to lay an adequate foundation for the photograph because it could not account for what might have happened to the victim during the several hours between when the doctor last saw the victim alive and when the pictures were taken. We held that this argument went to the weight that might be given the photographs, not their admissibility. *Id.* We believe the same is true here with respect to the State's claim that Jill had been handled and transported from the Bronco to the medical examiner's office before the photograph was taken. If admitted, the State would have been free to challenge the weight to be given the photograph as it related to depicting a possible source for Jill's blood on Camm's t-shirt.

We need not address any more issues in this case in detail. However, we do trust that some of the claimed instances of prosecutorial misconduct were unintentional and will not be repeated in any retrial, such as (1) questioning the defense blood spatter expert as to why his opinion conflicted with five other experts, when only two experts had testified for the State; (2) asking Camm why he did not think domestic violence was "a big deal" when there was no evidence that Camm had ever battered Kim, Tr. p. 6750; and (3) representing that a certain witness would be called later and could be questioned directly by defense counsel, then failing in fact to call that witness and protesting when defense counsel sought to do so.[11]

### Conclusion

Camm was unfairly prejudiced by the introduction of extensive evidence and argument regarding his poor character, where the evidence regarding his philandering was not reasonably related to any proper purpose under Indiana Evidence Rule 404(b), including proof of motive. We reverse his three convictions for murder.

Reversed.

CRONE, J., and BAKER, J., concur.

---

11. Defense counsel was cross-examining one of the State's blood spatter experts about whether another expert had changed his mind regarding some of the blood spatter evidence, when the State objected and said "I think when Mr. Bevel [the uncalled expert] gets here, Mr. Bevel can speak for himself." Tr. p. 4956. Defense counsel then agreed to limit his cross-examination "if representation is he's going to testify...." *Id.* The State did not verbally respond to this comment.