# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 11 2020, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald E.C. Leicht
Peru, Indiana

ATTORNEY FOR APPELLEE

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gurth Bryan,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | June 11, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2954<br><br>Appeal from the Howard Superior Court<br><br>The Honorable Hans Pate, Judge<br><br>Trial Court Cause No.<br>34D04-1711-F1-213 |

**Brown, Judge.**

[1] Gurth Bryan appeals his convictions for attempted voluntary manslaughter as a level 2 felony and aggravated battery as a level 3 felony. He asserts the trial court abused its discretion in admitting certain evidence. We affirm.

## Facts and Procedural History

[2] In 2014 or 2015, Bryan and Celia Jackson began dating, and they had a child in 2015 and separated that same year.[1] Bryan and Jackson had a "rocky" relationship, and Jackson obtained four no contact orders against Bryan in 2016 because she was scared and did not want to be bothered. Transcript Volume II at 185. The last no contact order was issued on September 26, 2016, and was still in place in November 2017.

[3] At some point, Jackson and David Langston began a relationship and lived in an apartment at Amberwood Place in Kokomo beginning in February or March 2017. Langston met Bryan about four or five times when Bryan was picking up his child. Langston did not argue with or have any ill will towards Bryan prior to November 23, 2017.

[4] On November 23, 2017, Langston was planning to travel to Chicago with Jackson who was five months pregnant. That morning, Jackson called Bryan twice because he was supposed to pick up their daughter for Thanksgiving.

---

[1] The parties' briefs refer to Jackson's first name as Celia. The transcript includes spellings of her first name as Celia and Celie.

Bryan did not answer, and Jackson dropped their daughter off at the house of Jackson's grandmother and texted Bryan.

[5] Bryan called Jackson's phone, Langston answered, and Bryan said he "was looking for his baby." *Id.* at 137. Langston told him he would have to call later and hung up the phone. While Langston and Jackson were outside, Bryan sped through the "wrong side" and immediately exited his vehicle. *Id.* at 169. Bryan asked where his daughter was, and Jackson asked Bryan: "[W]hy are you pulling up, your daughter's not here, there's no reason for you to come over here." *Id.* at 194. Langston and Bryan started "having words," and Langston told Jackson to "get in the car." *Id.* at 142.

[6] At some point, Jackson was sitting in the driver's seat with the door closed, and Langston walked in front of the door so that he was between Jackson and Bryan. Bryan went around Langston and tried to open the door and take Jackson out of the car. Langston told Bryan to stop and "kind of wrestl[ed]" with Bryan to prevent him from pulling Jackson out of the car. *Id.* Bryan pulled a gun from the front of his pants, and Langston ran to the other side of the car and entered it. Langston told Jackson to pull out, and Bryan opened the door, pushed Jackson out of the way, and shot at Langston five or six times behind Jackson's head. The window of Jackson's car was "blown out," and Langston suffered a gunshot wound to his shoulder and two to his back. *Id.* at 145. After he was shot, Langston exited the car, screamed, and collapsed on the ground.

[7] Jackson transported Langston to a hospital in Kokomo, and he was subsequently airlifted to a hospital in Indianapolis. Jackson called her mother, Bryan's mother, and Langston's mother. After the incident, Bryan called Jackson and told her he was going to "hurt anybody that got into his way" and he "was going to kill [Langston's] family and that he was not going to turn himself in." *Id.* at 201-202.

[8] On November 28, 2017, the State charged Bryan with attempted murder as a level 1 felony and aggravated battery as a level 3 felony. On June 10, 2019, the State filed a Notice of Intent to Use 404(b) Evidence indicating it intended to present evidence that:

> (1) Bryan was charged with domestic battery against Jackson under cause number 34D01-1606-F6-573 ("Cause No. 573"), a no contact order was issued on or about June 22, 2016 to protect Jackson, he violated the order on July 1, 2016, and was convicted of domestic battery on September 5, 2017.
> (2) He was charged with strangulation and domestic battery against Jackson under cause number 34D01-1607-F6-629 ("Cause No. 629"), a no contact order was issued on or about July 1, 2016, against him to protect Jackson, he violated the order on or about July 14, 2016, and he was convicted of domestic battery on September 1, 2017.
> (3) He was charged with domestic battery, criminal recklessness, and criminal mischief under cause number 34D01-1607-F6-690 ("Cause No. 690") on July 14, 2016, the victim was Jackson, a no contact order was issued on or about July 15, 2016, and again on or about September 1, 2017, against him to protect Jackson, he violated the no contact order that was originally issued on July 15, 2016 on or about September 24, 2016, he violated the no contact order that was originally issued on September 1, 2017 on

or about November 23, 2017, he was convicted of criminal mischief on September 1, 2017.

(4) He was charged with burglary with a deadly weapon, domestic battery by means of a deadly weapon, and criminal recklessness with a deadly weapon under cause number 34D02-1609-F2-274 ("Cause No. 274"), the victim was Jackson, a no contact order was issued on or about October 3, 2016 against him to protect Jackson, and he was convicted of domestic battery with a deadly weapon on July 11, 2017.

The State alleged the evidence was relevant and admissible to show motive, intent, identity, common scheme and plan, and/or absence of mistake or accident. On August 23, 2019, Bryan filed an Objection to 404(b) Evidence asserting the evidence was only offered for proof of his propensity to commit a crime and the probative value was vastly outweighed by the prejudicial effect. After a hearing, the trial court overruled Bryan's objection.

[9] During his opening statement, Bryan's counsel stated: "I mean the motive in this case, as I understand it is, according to [Jackson], [Bryan] was upset that she had been abused by this David Langston." Transcript Volume II at 55. At the jury trial, Langston and Jackson testified that Bryan shot Langston. Bryan's counsel questioned Langston regarding a firearm found by paramedics and questioned Jackson regarding a firearm found on Langston or in her vehicle. When asked if he was one hundred percent sure that Bryan was the person who shot him, Langston answered affirmatively. During cross-examination, Langston answered affirmatively when asked if it would be "fair to say that [he] pretty much continually represented to the police officers" that he did not know "who did this." *Id.* at 165. Langston answered affirmatively when asked: "So

would you agree with me it wouldn't have taken much of a marksman to put a couple of shots in your head if he intended to kill you." *Id.* at 168.

[10] Without objection, Jackson testified that she had a "rocky" relationship with Bryan and had "problems" with him. *Id.* at 185. When asked if there came a time in June 2016 that she had to ask for a no contact order, Bryan's counsel objected on the basis of Evidence Rule 404, and the court overruled the objection. Jackson indicated she requested a no contact order in June 2016, Bryan violated the order, she called the police, another no contact order was issued on July 1, 2016, Bryan continued to show up in her presence, she obtained another no contact order on July 13, 2016, another incident occurred, and she obtained a no contact order on September 25, 2016. When asked if something happened in each of those situations, Jackson answered: "He would have, he would have come at me with violence. He'd have a gun on him every time he would come, threaten me with things that (inaudible)." *Id.* at 191. The court admitted the no contact orders in Cause Nos. 573, 629, 690, and 274. At the end of cross-examination, Bryan's counsel moved to strike any testimony and evidence "in regards to the 404 issue because at this point in time there is just absolutely no evidence that this is necessary to prove murder to hurt this witness." *Id.* at 216. The court stated: "The ruling wasn't based on murder to her, this witness, so it's overruled at this time." *Id.*

[11] On redirect examination and without objection, Jackson indicated Bryan's behavior was "crazy" when she was dating another man. *Id.* Jackson indicated there were violent incidents with a gun which were among the reasons for the

no contact orders. Bryan's counsel objected and asserted: "We have no date, no time, no relationship to any of this." *Id.* at 217. The court overruled the objection. Jackson testified that Bryan was a jealous person, his behavior was predictable, and he would "just randomly show up" while she was with other men. *Id.* She indicated she reported these incidents and charges were filed.

[12] Kokomo Police Detective Jon Webster testified that it took Langston approximately three months to identify Bryan. After the State rested, Bryan's counsel moved for judgment on the evidence on the charge of attempted murder as a level 1 felony, and the court denied the motion.

[13] The jury found Bryan guilty of attempted voluntary manslaughter as a level 2 felony as a lesser included offense of attempted murder, and aggravated battery as a level 3 felony. The court sentenced Bryan to concurrent sentences of thirty years for attempted voluntary manslaughter as a level 2 felony and sixteen years for aggravated battery as a level 3 felony.

## *Discussion*

[14] The issue is whether the trial court abused its discretion by admitting certain evidence. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46

N.E.3d 1232, 1235 (Ind. 2016). We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[15] Bryan argues that the existence of no contact orders against him with respect to Jackson presents no motive nexus regarding charges that he did something to Langston and cites *Camm v. State*, 812 N.E.2d 1127 (Ind. Ct. App. 2004), *trans. denied*. The State argues that the trial court was correct to admit evidence of motive and that, even if the ruling was erroneous, any error was harmless. It asserts the conflicted nature of Bryan's relationship motivated his arrival and the fact that he was armed and shooting at his former partner's boyfriend was perfectly consistent with the motivation that it set out to prove. It also asserts the evidence helped to prove the relationship between the parties.

[16] Ind. Evidence Rule 404(b) provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Rule 404(b)(2) provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

[17] The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403.[2] *Boone v. State*, 728 N.E.2d 135, 137-138 (Ind. 2000), *reh'g denied*; *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997). The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct. *Crain v. State*, 736 N.E.2d 1223, 1235 (Ind. 2000). The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission. *Id.* If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence. *Boone*, 728 N.E.2d at 138. For instance, evidence which is necessary for the jury to understand the relationships between the victim, various witnesses, and the defendant may be admissible. *See Wilson v. State*, 765 N.E.2d 1265, 1270-1271 (Ind. 2002).

[18] In *Camm v. State*, the court addressed whether the trial court committed reversible error during the trial for the murder of Camm's wife and children by

---

[2] Ind. Evidence Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

allowing the State to present extensive evidence of extramarital sexual activity by Camm. 812 N.E.2d at 1129. The court held that, "to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and victim in the past, or that the defendant was involved in an extramarital relationship at the time of the completed or contemplated homicide" and that "[t]he admissibility of such evidence may be further constrained by concerns of chronological remoteness, insufficient proof of the extrinsic act, or the general concern that the unfair prejudicial effect of certain evidence might substantially outweigh its probative value in a particular case." *Id.* at 1133. The court observed that "there was no evidence of a violent or hostile relationship between Camm and his wife, nor any evidence that he ever threatened her with harm," that "[t]here [was] no evidence that Camm ever battered [his wife] or issued any threats, either to her directly or to others," and that "[t]here was no evidence that Camm was involved in an extramarital relationship at the time of [his wife's] murder." *Id.* at 1133-1134. The court concluded the trial court abused its discretion in allowing the State to introduce evidence of Camm's adulterous conduct because the tie between such evidence and motive, or anything other than simply portraying Camm as "bad," was too strained and remote to be reasonable. *Id.* at 1134. It also concluded that, even if this evidence had minimal probative value as proof of motive, its prejudicial effect substantially outweighed such value under Evidence Rule 403, particularly given the extent to which the State emphasized this evidence. *Id.*

[19]   Unlike in *Camm*, the evidence admitted in the present case involved Bryan's hostility toward Jackson when she was with other men. Jackson testified she had a "rocky" relationship with Bryan and had "problems" with him. Transcript Volume II at 185. She testified Bryan continued to show up in her presence despite no contact orders, there were violent incidents with a gun, and the most recent no contact order was entered in September 2016 and was in place during the shooting. She stated Jackson "would have come at [her] with violence," would "have a gun on him every time he would come," and would threaten her. *Id.* at 191. She also testified Bryan was jealous, his behavior was "crazy" when she was dating another man, and he would "just randomly show up" while she was with other men. *Id.* at 216-217. Accordingly, we find *Camm* distinguishable.

[20]   The challenged evidence was admissible to show motive. *See Hatcher v. State*, 735 N.E.2d 1155, 1159 (Ind. 2000) (holding that an emergency protective order was relevant to motive and the history of the victim's relationship with the defendant). It was necessary for the trier of fact to understand the relationship between Bryan and the victims. *See Wilson*, 765 N.E.2d at 1270-1271. When asked if he was one hundred percent sure that Bryan was the person who shot him, Langston answered affirmatively. Jackson answered affirmatively when asked if she was one hundred percent positive Bryan shot Langston. We cannot say that the evidence violated Evidence Rule 404(b) or that its probative value was substantially outweighed by the danger of unfair prejudice. Even assuming the evidence was inadmissible, in light of the overall strength of the State's case,

the context of the challenged evidence, and the jury's finding of guilt of the lesser included offense of attempted voluntary manslaughter as a level 2 felony as opposed to attempted murder, we conclude that the probable impact on the jury was minimal and that reversal is not required.

[21] For the foregoing reasons, we affirm Bryan's convictions.

[22] Affirmed.

Najam, J., and Kirsch, J., concur.